Good morning, everyone. Our first argument of this morning's calendar is in Appeal No. 22-17-24, Fidelity and Deposit Company of Maryland v. TRG Venture Two. And we'll begin with Mr. Korop. Good morning to you. You're welcome. May it please the Court, Counsel. My name is Dave Korop, and I represent F&D. I will be addressing the issues today concerning the bankruptcy court's interpretation and application of the Supreme Court opinion antagraphy, Lorenzen. And if it please the Court, my associate, Ken Thomas, will be addressing the jurisdiction issues at the end of my presentation. Despite this case's long and somewhat complicated procedural history, the issue before this Court is straightforward. Did TRG prove, by clear and convincing evidence, that there was no objectively reasonable basis to conclude the planned release might release TRG? And I emphasize the word might because that's the exact word the Supreme Court used in articulating the standard that a bankruptcy court is to apply. The Court said that the there was no objectively reasonable basis to conclude the creditor's conduct might be unlawful. And that worst use of the word might teaches us that it wasn't sufficient for TRG simply to prove that a reasonable interpretation of the planned release would have released TRG. It wasn't sufficient for TRG to prove that the most reasonable interpretation of the planned release was to release TRG. Release TRG or release the indemnity claim? What's the right question there? Release F&D's indemnity claims against TRG. Okay, well they weren't held against TRG in the first instance, right? In what sense, Your Honor? The indemnity agreement was not with TRG, right? It was with, what, Kimball Hill, KHI? Exactly. And those indemnity claims were completely different. Those indemnity claims were based on a bond that had a contractual obligation that required the debtors to indemnify F&D in the event Kimball Hill did not perform. Those bonds did not apply to anyone else's failure to perform whatever other obligations they may have. And what we've learned from the Illinois Appellate Court is that TRG's obligations under the annexation agreements are not the same as the debtors. And in fact, the Illinois Appellate Court held that both parties at some point became jointly liable to perform those obligations. And the reason we know this is because it wasn't necessary for F&D to obtain common law indemnity against TRG to prove that it had an indemnity agreement that was still enforceable with the debtors. In fact, that claim had been released. The only thing that F&D had to prove on its indemnity claim was that it performed the obligations under the annexation agreements, which it owed to the cities, which were not released, and that that bestowed a benefit on TRG, who also had its own separate obligations under the annexation agreements to perform those obligations. And what the Illinois Appellate Court held was in that situation F&D is entitled to common law indemnity because it has bestowed a benefit on TRG. It did not have to prove in any way that at some point the debtors also owed indemnity under a contract for their separate obligations to perform under the annexation agreements. And importantly, TRG didn't have to establish that the debtors didn't perform the obligations under the annexation agreements. That was not part of its case. Once it purchased the properties, it obtained its own separate obligation to perform under the annexation agreements. And in fact, in the lower court, in the circuit court, one of the defenses that TRG asserted was that when the debtors were released under the annexation agreements, the annexation agreements themselves were released. And it lost that argument in the appellate court. The appellate court held in no uncertain circumstances that now that TRG was the owner, it now had obligations under the annexation agreements. So your contention, if I have it straight then, is that it's not so much that TRG stepped into the contractual indemnification obligation that was held by KHI, but rather by operation of common law and taking on the performance obligation under the annexation agreements that brought with it a common law indemnity obligation. Exactly. And F&D did not bring a claim against TRG for breaching the bonds that F&D had entered into with the debtors. That was not at  Why isn't the common law, if I understand the theory, why isn't the common law indemnity obligation extinguished upon plan confirmation, maybe a better way to say that is extinguished upon TRG acquiring the properties free and clear? Because, and this is important, TRG did not acquire these properties free and clear. That is made explicitly clear in the lower court record. TRG never contended in the lower court that it was released from the annexation agreements, and in fact if you'll recall the bankruptcy court in its 2017 opinion says the parties don't dispute that the annexation agreements continue to be binding in this case. And what the Illinois appellate court held was that simply by buying the property, a new obligation arose on behalf of this new buyer. That's how annexation agreements work. They are a creature of contract, but they're also a creature of statute. And that's why TRG did not purchase this property free of the annexation agreement. The other thing we know, and it's undisputed, is that the municipalities never released their claims against TRG. But wasn't that a losing argument in several of the state court cases? No. The release was never addressed in the state court. TRG for six years never contended it was released in the state courts. That issue was never raised. The only thing that TRG ever brought up in the state court was that somehow the bankruptcy, because it released the debtors, that somehow extinguished the annexation agreements. And we know from the Illinois appellate court decisions they rejected that. And they said, absolutely not. The annexation agreements continue to bind. So that's a key point. TRG never understood it was released at the time it purchased these properties, and for six years never asserted that defense. And it was an obvious defense in this case. Why would you possibly litigate in five separate circuit courts on the merits of the case when you have a release that you contend not only releases F&D's claims, but there's no objectively reasonable basis to read them in any other way. And there's record evidence that we've cited to where TRG argues to, because remember, back in 2017 when we weren't applying TAGR, one of the defenses that F&D raised was latches and waiver. F&D said, well, wait a minute TRG. You waited six years to finally raise this. It's too late. So in the bankruptcy court, TRG argued it didn't understand that it had been released. That was its theory. And so it said to the court, why would we ever sleep on our rights, your honor, when we could just come before this court and in one fell swoop moot these arguments? This may sound like a strange question, but you read the bankruptcy court order, you read the district court opinion, and they seem to be talking about a different case than you're describing. They seem to be saying this is a blatant, an intentional and blatant violation of the plan confirmation order. Why is it that they're so far afield from what you're now describing? I have two responses. Those opinions say it's not even close. This is deliberate. Yes. And let me explain why this, I believe, is one of those unique cases, and I know they're unusual, where the common law record simply does not support these factual findings. Remember, back in 2017 and 2019, Taggart was not the standard. So there was no requirement to prove that TRG's or F&D's subjective knowledge one way or the other. The only thing the bankruptcy court cites are snippets from the litigation committee at F&D that referred to litigation as novel or unique or testing a theory. We would submit that's far from clear and convincing evidence that F&D knew with certainty that TRG had been released. And keep in mind how any lawyer would advise a client in this situation. There are many times when you tell a client, you have a 60% chance of losing, you have a 40% chance of winning. And we're going to make the 40% argument because there's an objectively reasonable basis to make that argument. It might be wrong. It might not be the most reasonable argument. But Taggart is a rigorous standard. Taggart says there has to be no objectively reasonable basis to make this argument. So we would submit to you, Your Honor, that the only and let's look at what else the bankruptcy court cited in 2020. And remember, this was a sea change in how bankruptcy courts were allowed to hold parties in contempt. Before this, as Taggart points out, it was akin to strict liability. You just had to prove the creditor knew of the bankruptcy order and intended to do what it did. The other thing the bankruptcy court refers to as showing F&D knew is, and I'm going to quote here, F&D knew based on the prior case law involving it the results of its actions taken before this court, the state court, and the district court, that it was acting in contravention of the plan injunction. Under Taggart, F&D would therefore be subject to civil contempt. Well, we know that the bankruptcy court decisions in 2017 and 2019 were pre-Taggart decisions. So they didn't apply that standard. We also know they came years after F&D sued TRG. They couldn't have possibly provided F&D with knowledge at the time it sued TRG. We also know that the state court decisions never addressed the release at all, let alone Taggart. And finally, we know the district court couldn't possibly have provided that knowledge because the district court didn't apply Taggart. It vacated and remanded the case so that the bankruptcy court could do that. The other thing I would suggest, Your Honor, is if you make subjective, what the bankruptcy court here did was, rather than applying an objective standard, reading the confirmation order, applying Illinois rules of contract construction, and identifying ambiguities and construing them against TRG's interpretation. That's what the bankruptcy court did. It did not objectively try to figure out is there an objectively reasonable argument. Instead, it first decided, did F&D have an understanding that TRG was released? It then proceeded to shift the burden completely to F&D to prove that the plan release was unambiguous in not releasing TRG. That effectively made F&D's subjective understanding dispositive. And that's exactly how TRG, in its brief, argues to this court that is the standard according to TRG. They say even if it is subject to credible debate about what the plan release means, as long as F&D had this understanding, it should be held in contempt. And we would submit, Your Honor, there's absolutely no support in Taggart for that shifting of burden or for making contenders' supposed subjective understanding completely dispositive of the issue. Why don't we hear from, you want to save a little rebuttal time? Why don't we hear from Mr. Thomas on the, you said jurisdictional issue, correct? Thank you, Your Honor. May it please the court. Ken Thomas on behalf of F&D. The bankruptcy court exceeded its subject matter jurisdiction when it interpreted and enforced the plan release and injunction to apply to claims that it could not have enjoined in 2009. F&D's claims against TRG had not yet arisen at the time that the plan injunction was entered, as TRG had not taken title to the property, in this case, until 2010. When those common law claims arose, they didn't arise under the bankruptcy code. They arose under the Illinois common law. And they didn't arise in a bankruptcy case because they could be litigated in the state courts and they weren't unique to bankruptcy. As to related to jurisdiction, these claims does not directly and substantially affect the amount of property available for distribution to creditors or the allocation between creditors, a narrow standard as the Seventh Circuit interprets it. And that's the case for two reasons. First, TRG is not a creditor of the bankruptcy estate. It never filed a proof of claim. So this could not be a dispute about the allocation of property among creditors. As to the property available for distribution, TRG doesn't allege that there has been an effect on the property available for distribution. Why is there a lack of jurisdiction, though, under 1334 related to when the argument is that TRG is violating an indemnity obligation that was extinguished upon plan confirmation? Your argument, Mr. Thomas, seems to me more to be one on the merits of the underlying question. But why does the district court lack jurisdiction to resolve that contention? As with any injunction, Judge Schroeder, every court that enters an injunction over certain claims has to have jurisdiction over those claims. No, I get it. Absolutely. But if your argument is right on jurisdiction, I don't understand how the 2019 Travelers Insurance case is correct. Or for that matter, why is there no lack of federal jurisdiction in Taggart itself? Well, let me address the Taggart question first. Because Taggart was enforcing a discharge injunction provided by statute. Those rights arise under the Bankruptcy Code. So we're not talking about a discharge here. We're talking about a consensual plan release. And under Travelers, and those are different, because one is provided by statute and has to be provided in a Chapter 7 case, which is what Taggart was. And the other is provided by consent of the parties. In fact, 524 of the Bankruptcy Code says that certain bankruptcy cases, which is what this is, are not entitled to statutory discharge. They're not entitled to a discharge under the Bankruptcy Code. And so they only get what the parties write in a specific release. And that's not a right provided under the Bankruptcy Code. As to your second question about Travelers, Travelers tells us that parties cannot challenge the subject matter jurisdiction of a court to enjoin claims in a subsequent proceeding if the parties had a full and fair opportunity to litigate subject matter jurisdiction in the first instance. And here, there was no full and fair opportunity. Neither of the parties understood this plan release to apply to F&D's claims, as is clear in the record. And in Travelers, they relied on an unambiguous injunction. That's why they read the injunction first and held it to be unambiguous. And as a result of that, they were collaterally barred from challenging it. But here, we've always maintained that the plan release is ambiguous. The parties did not have a full and fair opportunity to litigate that question. And this was the first time we had an opportunity to do it. And I'll add that one of the exceptions to collateral bar, if Your Honor is inclined to find that, is that it would impinge substantially on the jurisdiction of another tribunal. And the state courts have been litigating this for six years on a question that, if there is related to jurisdiction, is concurrent jurisdiction. And so to come to the bankruptcy court and say, hey, we're going to find another route to winning our cases in the state court, we would think that that would be an exception to the collateral bar challenge. Thank you. Thank you, Your Honor. May it please the Court. Bill Floresness for Appellee TRG. Before I begin my prepared remarks, I just wanted to respond to a few points the opposing counsel made. First of all, that we somehow conceded in the lower court that the annexation agreements were either relevant or binding. That's simply not true. Or that the municipalities had continuing, or that we have continuing obligations to the municipalities. None of that was conceded. Judge Barnes assumed that to be true, because in the first few pages of our motion, and at every hearing, we said that doesn't matter. Judge Barnes agreed that neither the annexation agreements nor any obligations that TRG might allegedly owe to municipalities does not matter here. And we'll get to why. Does not matter for purposes of an indemnification obligation? Does not matter for purposes of whether the injunction precluded fidelity from suing us. On what? The indemnification obligation. Absolutely. Now, in addition, counsel stated that we never, the record shows that TRG never understood that we were released, and that's why we never pursued in the bankruptcy court earlier than we did. That's also not reflected in the record. Rather, what the bankruptcy court found, what the record establishes is that TRG did not know it had a superior remedy in bankruptcy court until 2016. And that's based on the credibility determinations that the bankruptcy court heard, and that's based on the fact that until that time, TRG had no need to evaluate other remedies. That is supported by this court's decision in Chicago, Milwaukee in 1993. So what happened was, in 2010, no one had seen this type of an aggressive suit by a surety in the country's history. Fidelity admitted it had never tried this before ever. Fidelity admitted no other surety had ever tried this before. Suing successors, notwithstanding a bankruptcy order, after a sale. Fidelity gambled knowing, in a down market, attempting to preserve its bottom line. And TRG, when it was first sued, spoke with all of its lawyers, spoke with its SunCal, the largest private real estate developer at the time in the country, who bought 15,000 lots out of bankruptcy at the time at hundreds of years of experience with these exact issues. No one had ever seen these claims before. So they huddled, they talked about it. What is the quickest way we can get out of these cases, these state court cases, so that we can go on and sell the properties? And so they came up with a consensus which was, let's file motions to dismiss on these bases in all five cases, and they won every time, quickly. None of these cases led to discovery. The dismissals were worth prejudice. And it was only until Fidelity pursued an appeal in the Elgin case and the Elgin court reversed, which is effectively a first of its kind decision, on motions to dismiss in late 2015 did TRG realize, we've got a problem here. They're going to do this in every case. We are not in. This is not a short litigation with Fidelity. They're going to do this in every case. We're going to have to deal with discovery. And so they reconsidered their options, which is what any rational actor would do. It then realized it could come into bankruptcy court and seek enforcement of the confirmation order. That's what the record reflects. We agree on the Taggart issues, Judge. We agree with Fidelity that this is a single issue case. After six years, 100 pages of judicial decisions, four day trial, years of discovery, did Judge Barnes abuse his discretion in finding that there was not a fair ground of doubt that these acts were enjoined? Now, whether it's before Taggart or after Taggart, to answer that question, one would naturally look to the four corners of the confirmation order, informed by context, and ask whether there is any supporting case law to sustain that proposition. Can you put a bookmark on that thought? Because Mr. Thomas has argued there's not even Judge Barnes doesn't even have jurisdiction. Absolutely. Well, we can turn that first, Judge Scudder. Sure. There are multiple bases for jurisdiction. The first is that there is clear core jurisdiction. Whenever you have a buyer from a liquidating trustee, as here in a Chapter 11 case, coming back in, enforcing a confirmation order before any distributions are made in the case to unsecured creditors against the pre-petition disgruntled creditor, that is core jurisdiction arising in and arising under. Their only argument in response to that is that there was not a core discharge injunction. And while that might be true, that's a distinction without a jurisdictional difference because there is multiple statutes under the Bankruptcy Code and participation in the case which demonstrate that this invokes a substantive bankruptcy right. All over the confirmation order and the debtors briefs in support of the confirmation, they rely on 1123B3 and B6, as this court itself relied upon in the Ingersoll case in 2009 to support the enforcement and implementation of an injunction in a liquidating Chapter 11 case. This is not a reorganized Chapter 11 case. So 1123 provides that direct injunction as well as Section 105, 1129, 1141, and 1142, which in every liquidating case, these are how injunctions are implemented and enforced. So there's core jurisdiction here. You can't resolve this case without evaluating the Bankruptcy Code. Second, to your point, Judge, the Travelers case and multiple Supreme Court cases, including multiple Seventh Circuit cases, squarely support the exercise of inherent jurisdiction here. A court, any court, any bankruptcy court, has authority to enforce its own injunctions, not simply interpreting an order. It's enforcing an injunction that it itself entered. Travelers, you can't dispute, you can't rebut the Travelers case, the statement it makes regarding jurisdiction. It's clear. They said it's easy. It's not a factual distinction. It's a legal proposition. Relatedly, there is ancillary jurisdiction of a bankruptcy court. This court held in 2013 in the Sweep Horse case that a bankruptcy court has ancillary jurisdiction. We didn't hear about that today, but Fidelity in its brief criticizes the language in that case, I'm sorry, characterizes, seizes upon the characterization of ancillary as clean-up jurisdiction, which is what the phrase Judge Posner used, and suggests that this can't be clean-up because look what happened. This took six years. How can this be clean-up jurisdiction? Well, that proposition cannot stand because if any time someone gets sued or defended in a contempt case, you can sandbag a jurisdictional defense by having an aggressive litigation strategy. So that promotes bad incentives. It has to be the substance of the dispute that is the proper jurisdictional test. And finally, related to jurisdiction. In the Bush case, which we also didn't hear about today, in 2019, this court held that the test related to jurisdiction is made at the time the dispute is filed, and at that time, what is the potential impact on creditors? So what do we know in 2016 July when TRD first filed this motion? We know two things. We know three things. First is that the Kimball Hill Trust was holding $55 million of claims of cash to distribute to unsecured creditors in Fidelity's class, the C2 class. It had not made a single distribution yet. It was hoping to do so within that year. At the same time, Fidelity had $4 million of liquidated additional claims that had not yet been allowed, but for which it absolutely could and should have sought reconsideration. And third, most dispositively, at the same time we filed our motion, Arch Insurance Company, its sister surety, filed a reconsideration motion, and the trust objected. We raised this in our opening brief. Judge Barnes overruled the trust's objection, granted reconsideration, because Arch also had liquidated claims to the municipalities. It was a pro forma exercise for Fidelity to seek reconsideration. The only argument they raised in response to that is a statute of limitations defense, that it was too late, could have been too late. That's wrong for at least three reasons. First, they only raised that on reply. We didn't have an opportunity to respond to it, so we submitted to waive. But more substantively, Fidelity's allowed claim in 2013 was not a final order to which Rule 60B applies. That's because it was expressly without prejudice to Fidelity's right to seek reconsideration under 502J. Judge Barnes invited reconsideration. In the event there was more paid out on the performance bonds? Absolutely. That's how it's done with sureties. It's a typical contingent claim of a surety. Well, we haven't come out of pocket yet, but let's wait until we do, and let's go assert our claims. And that's what Judge Barnes said multiple times, and that's how Arch was done. The last reason is that the statute of limitations does not apply to this type of a reconsideration. There's only three reasons under Rule 60B. Mistake, newly discovered evidence, and fraud. This is a B6 issue, as all of the cases that address surety cite, none of them of which are provided by Fidelity. All of them are provided by Arch in their papers. We didn't have a chance to submit those cases because we heard about it on reply for the first time. The last issue on jurisdiction I'll just raise is that we have no answer for why Fidelity never sought reconsideration. The only thing that now makes sense, they had $7 million of claims. This case paid out 55% distributions to unsecured creditors. But Kimble Hill trusted an outstanding job in a down market. That's $4 million Fidelity would have gotten. Why would they walk away from $4 million? We have never heard an answer to that. The only thing we can come up with is that they were trying to intentionally gain a jurisdiction defense. And that as a matter of law, in fact, that cannot be a reason, it cannot be relevant to jurisdictional analysis. Unless your client has more questions on jurisdictional analysis. Back to the Taggart issues. The confirmation order we submit is unambiguous. It passes property free and clear of all claims and claims as given the broadest definition possible and all interests which include success or liability claims. And the confirmation order gets Fidelity coming and going in that these claims are squarely released. This today is another collateral attack on the release that they voted for 14 years ago. But even if there's a dispute about whether it's released, these claims were settled. The injunction independently enjoins Fidelity from pursuing settled claims. It does seem there may be an issue of the shifting of the burden here though, which is a question that the attorney general is raising. Do you know of any post-Taggart cases that shift the burden to a defendant to show that there's no fair ground as opposed to the typical posture which is that the movement has the burden to show contempt? Yes, there are cases that do that, Your Honor, but I believe it's a false premise. What Fidelity is really saying is we, as a movement, have to divine in advance all potential arguments that Fidelity might make as to why this is objectively reasonable. What pre-Taggart and post-Taggart the burden is and should be, is there an order? Does the order prescribe certain conduct? Was that conduct taken? We've done all that here and more, and then naturally the contemnor should come to the court and explain why what they did  and the touchstone in pre-Taggart cases and certainly in all of the 325 cases as of yesterday that rely on Taggart is is there a supporting case law to support your position? There is not one case anywhere that allows a surety's claim to survive a confirmation order. Fidelity admitted that in its first hearing in October of 2016 and nothing has changed. So while some post-Taggart cases do discuss burden in that context, none of them shift the burden and allow the contemnor to blame the victim for why it violated the confirmation order. But all the Taggart cases, most of them at least, what they come down to is is there a supporting case law? There's none here. This is not a unknown tort victim case where a pre-petition manufactured defect, the tort victim didn't know that it had a bankruptcy remedy, didn't know it had a claim in the bankruptcy, and so those claims could survive for due process concerns. That's not this case. This is also not a, for example, private student loan case where on the one-line discharge order there's current debate in the courts on whether a student loan debt survives. That's not what we have here. There are multiple cases going both ways on all of those cases. There's not a single case supporting what Fidelity is asking you to overturn today. The claims are, let me back up, excuse me, Fidelity only first challenged the release that TRG is not a successor on its reconsideration motion in 2017. We submit that's waived, but even if it's not, Fidelity only contends that TRG is not a successor. That's their exclusive argument. They don't contend that we're not an assigned. But if we're not a successor, we are, but if we're not, we're absolutely an assigned. And how do we know that? We know it because paragraph 1A of the purchase agreement says Kimball Hill is assigning all of its interests to us. We also know that because Fidelity admitted that the plan does not, releases all claims against assigns. That's in their first appellate reply brief on page 37. Now what happened here makes perfect sense. The purpose of a liquidating plan is to channel all claims of creditors and maximize asset sales to maximize distributions to those creditors. That's what happens in every case. The successor and assigns blank provision is not some miscellaneous boilerplate that no one thought about. The debtor's brief in support of confirmation says this release is so essential because otherwise there will be a threat that pre-petition creditors can attack the liquidation trust and continue their claims. That's the whole purpose for these things. Now, how do we know that they are pre-petition contracts and did not somehow survive in addition to the absence of case law? A number of reasons. The bonds, however you want to characterize Fidelity's claims, they arise under pre-petition agreements. Whether they're bonds, whether they're annexation agreements, or whether they are the indemnity. All were executed pre-petition and all went in hand-in-hand with each other. Fidelity's would not have a claim against anyone but for the indemnity. They would not have a debt against anyone but for the bonds. They are a garden variety surety who bargained for this exact risk when it got premiums five years earlier and promised to bond the municipalities in the case of this exact situation. And that's why the municipalities and the annexation agreements require bonds. And that's why in favor of the bonds, in exchange for the bonds, Fidelity needs an indemnity. Now this court's St. Catherine's decision is squarely on point. Where it rejected the accrual test and held on to the conduct test, claims, we review when a claim arises at its earliest possible point. And here it's simple. These are contracts. When were they signed? All pre-petition. If you line up Fidelity's allowed claim, claim number 1636, and in that claim allowance order it identifies Fidelity's claim 1636. The docket number 3546 in that case is a 30 page document. If you line that up against the state court complaint that Fidelity filed against us, there's nothing different in there. They're identical claims. And they don't need to be identical, by the way, to be enjoined. They have to be related in any way. Fidelity's arguments wrongly focus on the alleged nature of our obligations, not on the nature of Fidelity's law. Surety law or release law. That is judged at the time Fidelity signs up to those bonds and signs those contracts. I have a hard time seeing why it is that if TRG has continuing development obligations under the annexation agreements that could somehow give rise to an indemnity obligation under performance bonds. That's the argument they're making at common law, right? The reason that you're emphasizing that this is pre-petition contractual, I think, the reason you're spending time on this is because your point is that was extinguished at plan confirmation. We took it free and clear of that obligation. Any of Fidelity's claims and obligations. Right. That's why you're focused on that. Your adversary was arguing, we're not arguing about contractual indemnity. We're arguing about common law indemnity. Post-petition common law indemnity. What's your response to that? The definition of a claim is as broad as possible, but it means right to payment whenever existing, arising in the future, based on any conceivable legal theory. The right to payment that Fidelity had existed before the case. Whether the property was sold and whether the property has binding obligations under TRG. The annexation agreements are certainly interesting and important. But they're not relevant for multiple reasons. Because if Fidelity believed it had a right to preserve, believed it had a right under annexation agreements that it wanted to preserve, it should have raised its hand and objected to the plan when it voted for it. Do you think that's what they're arguing? I don't think they're arguing that the indemnity obligation is somehow embedded within part of the annexation agreement. I don't think that's what they're saying. I think he's saying it's coming from common law based upon post-petition activity. But that post-petition activity was known inevitable before the bankruptcy case. And it's embraced with Fidelity's claim. Which is exactly what the bankruptcy court held. And St. Catharines as well. That the claim, the potential that a subsequent developer would have obligations under the annexation agreements was inevitable way back in 2007. They knew, Fidelity knew it would have liquidation on these bonds. It knew Kimball Hill was liquidating or was going to go away. It filed the UCC before the bankruptcy case. It asked for more collateral against Kimball Hill before the bankruptcy case. And in 2008, in the height of the Great Recession, they knew Kimball Hill was going away. But whatever rights a municipality has to enforce an annexation agreement obligation, rights that have never been established in fact under any case, that is an in rem right that a municipality has. It is not transform whatever Fidelity can get from a municipality is an in personam right. Fidelity admitted all it has, if anything, for the municipality is a quote, monetized legal remedy. All cases that Fidelity and Amicus cite related to annexation agreements hold that the annexation agreement is only enforceable and relevant to the party to it. The municipalities or landowners. Which is why they tried to get the municipality to sue TRG in state court. And a lot of that was unsuccessful. Exactly. It was all unsuccessful. Two municipalities ultimately did sue after in an election season. And those cases were quickly dismissed. But the record shows those municipalities would not have sued, would not have done anything, but for Fidelity's intent. If I can make one more final point. Go right ahead. State court dismissals, and then I'll end, we submit are entirely irrelevant for two reasons. First, is that they were decided on motions to dismiss where the courts all accepted the allegations as true. Those weren't municipality cases against TRG. They were up on Fidelity's counterclaims or third party claims against TRG. More importantly, those dismissal decisions were generated from contempt. They were the product of contempt. So Fidelity is arguing that somehow the fruit of the contempt can somehow sanitize the tree. And that's just now not how it works. Okay. Very well. Okay. We'll go back to Fidelity for about three minutes. A little more than three minutes for rebuttal. Your Honor, there are several points I'd like to briefly address. Number one, it's important for us to focus on the actual language of the plan release itself. The plan release only released parties that were identified in the plan release. So regardless of whether there might be another defense that a particular claim was released, no claim was released against a party unless it was identified in the plan release. Is that entirely the case, Mr. Korot? Because it's actually, it's standard contractual language that identifies debtors and then assigns and then successors and it's defined throughout the contract. Well, and let me address that. The plan release does not use the word successors. It's not in there. There's a miscellaneous provision that refers to successors and assigns. There are other parts of the confirmation agreement where, for example, holders of claims. That term, the party specifically said holders of claims includes successors. They didn't do that in the plan release. And under Illinois law, a court isn't allowed to accord meaning to that omission and that difference. And again, all we're trying to find here is was there any objectively reasonable basis to argue that TRG might not be released? It doesn't have to be the most reasonable. It doesn't have to be the interpretation that the court finds is the best interpretation. The question is was it objectively unreasonable? And we would submit if the language supports the argument, which it does here because the word successors is not in there and it is in other provisions. And there's Illinois case law that says a court is entitled to accord meaning to that. That, by definition, is an objectively reasonable argument. It might not be a winner, but it's an objectively reasonable argument. I couldn't be sanctioned for making that argument. There'd be no Rule 11 issue. And that's the Taggart standard. Taggart is saying can F&E even raise the question of whether TRG was released? And Taggart teaches us that yes, if you have at least an objectively reasonable basis to do that, you're allowed to raise the question. The other thing I would like to address is when these claims were originally filed, this was a reorganization. This was not a liquidation. And we know that at that time, you know, they had represented to the court that they had a legitimate basis to believe they might continue on as an ongoing business. And the last thing I would like to address briefly is the bankruptcy code gives the parties, the trustee and the creditors, the ability to decide what is the best way to maximize creditor recoveries. It doesn't require that the creditors release buyers from the bankruptcy estate. But if TRG's position is accepted, if the bankruptcy court's position is accepted, then that's a bright line rule. They always have to be released. And there is simply no authority for that. And in fact, in this case, it made sense, this is my last comment, because we know that the municipality's claims were going to continue no matter what. They weren't released. So there was no reason that they had to release FND's claims either. For that reason, Your Honor, we ask that the district court's two opinions be reversed and in the alternative that the contempt order be vacated. Okay, very well. Thanks to both counsel. The court will take the case under advisement.